UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


PHILLIP GREGORY BAL,

                    Petitioner,                Case No. 1:10-cv-21

v.                                        Honorable Robert J. Jonker

KENNETH T. McKEE,

                    Respondent.

_____/


## OPINION

        This is a habeas corpus action brought by a state prisoner, through counsel, under 28 U.S.C. § 2254. Promptly after the filing of a petition for habeas corpus, the Court must undertake a preliminary review of the petition to determine whether "it plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court." Rule 4, RULES GOVERNING § 2254 CASES; *see* 28 U.S.C. § 2243. If so, the petition must be summarily dismissed. Rule 4; *see Allen v. Perini*, 424 F.2d 134, 141 (6th Cir. 1970) (district court has the duty to "screen out" petitions that lack merit on their face). A dismissal under Rule 4 includes those petitions which raise legally frivolous claims, as well as those containing factual allegations that are palpably incredible or false. *Carson v. Burke*, 178 F.3d 434, 436-37 (6th Cir. 1999). After undertaking the review required by Rule 4, the Court concludes that the petition must be dismissed because it fails to raise a meritorious federal claim.

**Factual Allegations**

Petitioner Phillip Gregory Bal presently is incarcerated at the Bellamy Creek Correctional Center. Following a jury trial, he was convicted in the Dickinson County Circuit Court of one count of first-degree home invasion, MICH. COMP. LAWS § 750.110a(2), and one count of first-degree criminal sexual conduct (CSC I), MICH. COMP. LAWS § 750.520b. On July 18, 2007, he was sentenced to two prison terms of eleven to twenty years.

The following facts are taken from Petitioner's brief in support of his petition. (*See* Br. in Supp. of Pet., 8-35, docket #2.) The charged offenses involved the April 2004 rape of Linda Anderson at her home. Linda Anderson testified at trial that she knew Petitioner through his wife, Lori Bal, who was Anderson's best friend. When Anderson delivered a stillborn child a few weeks before the alleged rape, the Bals attended the funeral. The Bal and Anderson families also socialized. Anderson testified that, in April 2004, she went to dinner at the Blind Duck with her friend and next-door neighbor, Stacy Steinbeck. After dinner, the two stopped at a bar called Polly's Underground at Lori Bal's request. Anderson testified that she initially was reluctant to go, as she was not a drinker. She thought they were meeting Lori Bal only. When she arrived, she saw Petitioner, Phillip Bal. At some point, Anderson and Petitioner talked briefly. Petitioner asked how she and her husband were doing. Anderson reported that her husband was working.

Somewhat later, Anderson went into the bathroom with Ms. Steinbeck. Soon thereafter, Petitioner entered the bathroom. When Anderson came out of the stall, Petitioner pushed her up against the wall with his body and said that he knew she was there for a good time. Anderson testified that she did not remember how they got out of the bathroom, but she remembered that it was chaotic. Anderson mentioned to Lori Bal that her husband was too touchy-feely for her and that she

was very uncomfortable. Lori Ball told her not to worry, that was just the way her husband acted. According to Anderson, after the bathroom incident, she and Ms. Steinbeck tried to avoid Petitioner. At one point, they ran out of the bar and up the stairs to get away from Petitioner, who followed them, saying that he knew they wanted to have a good time and they shouldn't leave.

After Anderson had returned home, she heard a knock at the door. Answering it, she found Lori Bal and Petitioner, who were returning a jacket she had left at the bar. While Petitioner was there, he approached Anderson, saying, "I want to come back and I want to be with you[."] (Br. in Supp. of Pet., 10.) Anderson testified that she replied, "No, no, no." (*Id.*) After the Bals left, Anderson went to bed with her two-year-old son. Petitioner awakened her, startling her and making her think that an accident or something bad had happened. Anderson got out of bed, and they both went downstairs. When they got downstairs, Petitioner pushed her against the wall, pinning her so that she could not move. Petitioner grabbed her hand and put it on his penis, saying "[F]eel my cock, it's hard for you. You want this. This is for you." (*Id.* at 11.) Anderson testified that she told Petitioner she was not interested and that she could not have sexual intercourse because she had recently had a baby. Petitioner forced Anderson to the floor and overpowered her.

Anderson did not tell anyone about the rape for eight months. In the interim, she told both her husband and Stacy Steinbeck that Petitioner had come back to her home and wanted sex, but she claimed that nothing had happened. About eight months later, Lori Bal came to Anderson's house, and they watched the Dr. Phil show on the topic of "cheating husbands." Anderson testified that Lori Bal told her that, if her husband ever cheated, she would leave him. Anderson felt compelled to tell her that her husband had come over and wanted to have sex, though she denied that anything had happened. Lori Bal immediately called Petitioner, who told her that he had had

consensual sex with Anderson. Lori Bal asked Anderson if she was going to go to the police. Anderson told Lori Bal that she did not want anyone to know about the incident and wanted to forget it. Anderson then told her husband, who suggested going to the police. Anderson asked him not to, but he ultimately reported the assault.

Stacy Steinbeck testified that she and Anderson had gone to dinner at the Blind Duck. They went on to Polly's because Anderson had mentioned that Lori Bal had invited her to meet there. Steinbeck recalled going to the bathroom with Anderson, and she witnessed Petitioner go into the bathroom while she stood outside. Petitioner asked what the two women were doing later and if they "liked to have fun." (*Id.* at 15.) Steinbeck testified that she told Petitioner he was crazy and to get out, but he did not. She did not witness any physical contact between Petitioner and Anderson.

When Lori Bal and Petitioner delivered Anderson's jacket to her later that evening, Steinbeck was with them. She did not hear about any inappropriate comment by Petitioner. She remained at Anderson's house for about an hour. Steinbeck testified that, about a week after the incident, Anderson told her that she had woken up to find Petitioner standing next to her bed and that he wanted to have sex, but Anderson told him no and he left. Months later, Steinbeck was told about the alleged assault.

Brodie Anderson, the complainant's husband, testified that his wife told him in April that Petitioner had come into their home and had awakened her, but she had told him to leave. In December, his wife told him that she had been sexually assaulted. Brodie Anderson immediately called Petitioner, who did not say much before Brodie Anderson hung up on him. No police report was filed immediately. When Brodie Anderson learned from a friend, Trooper Boyer, about other allegations of sexual assault, he persuaded his wife to make a police report.

-4-

The trial court allowed two other women to testify about sexual assaults by Petitioner, subject to a limiting instruction that the evidence was to be used only to show a common scheme or plan. Janine Willman testified that she originally met Petitioner on March 20, 2005, when he was working as a police officer who responded to a request of her roommate. The next time she saw Petitioner was at the Greenleaf Bar on May 20, 2005. She was ordering drinks with her friend Jamie and talking to a couple seated at a table near the bar. That couple was Petitioner and his wife. Petitioner remembered Willman from the prior meeting, though Willman did not initially remember Petitioner. When she and her friends were leaving, Petitioner asked where they were going. Willman told Petitioner they were going to the C&R bar. When she arrived at the C&R, Petitioner was standing to the right of the door. Willman went to the bar to order a drink. Petitioner offered her a beer. Jamie took the beer while Willman waited for her mixed drink. Willman testified that, while she was waiting, Petitioner made a comment about her breasts and asked if he could see and touch them. She walked away and went over to a pool table, where Petitioner was standing. She asked him where his wife was, and he told her "his wife was out in the parking lot in a truck fucking some guy." Willman told the bartender that she was being harassed, and then she sat at the back of the booth. Petitioner continued to try to speak to her, standing behind her seat. He grabbed her left arm by the wrist and said he wanted to talk to her. They went down a hallway toward the bathroom. Petitioner then turned her against the hallway and touched her left breast. She told him to stop and said that people in the bar were watching him. She then walked back to her friends Timmy and Jamie, who had been watching. Willman was upset, but she remained in the same area until nearly closing time. She saw Lori Bal come into the bar at about 1:30 a.m., and she thought that the Bals left shortly thereafter. Willman herself went to leave the bar and saw Petitioner standing just inside

the door, where she had seen him at the beginning of the evening. Petitioner took her hand and placed it on his crotch, saying that this was for her. Willman then went into the adjacent bathroom. When she left the bar, Petitioner called to her from his car, saying that he wanted to talk. She walked over to the vehicle and talked through the window.

Willman walked a block and a half to her friend Timmy's house. While Willman was there, her friend Jamie received a phone call from Petitioner. Willman took the phone and said hello. At the same time, Willman's 18-year-old son called her and said someone was at her house who wanted to talk with her. Petitioner, calling from Willman's house, told her he would be coming for her in 15 to 20 minutes. Willman did not see Petitioner later that evening. Willman did not make a police report that night, but her friend called the police, and Willman met with Lieutenant Revord about 24 hours later. No police report was made.

Scott Willman, Janine Willman's son, testified that he was babysitting on May 21, 2005. At approximately 2:00 and 2:30 p.m., Petitioner came to the door. Scott recognized Petitioner from seeing him when he was in uniform. Petitioner told Scott that he needed to find Scott's mother, and Scott made some calls to locate her. Scott testified that he found his mother and she asked to speak with Petitioner. Petitioner then left the residence. He returned 20 minutes later, inquiring where Mr. Willman was. Petitioner then left.

Rachel Richmond first met Petitioner when she called 911 on October 2005, reporting domestic violence. The next time she saw Petitioner was April 21, 2006 at the Off-the-Wally's Bar in Iron Mountain. Richmond went to the bar to meet two girlfriends who were already there. When Petitioner entered the bar, Richmond recognized him and approached him to thank him for his assistance and for making sure she went to Caring House. She offered to buy him a beer. Petitioner

later sat in the open seat to Richmond's left and asked her to buy the beer she promised. After some casual conversation, Petitioner grabbed Richmond's face and kissed her on the lips. She slapped his hand and then walked away and went to a room containing a pool table and video games. As she was inserting a dollar bill into a machine, she heard her name and saw Petitioner standing in front of her, asking her where she was staying that night. Richmond returned to her table. Awhile later, Petitioner again came to her table, sat next to here, and kissed her twice more in the same manner as before.

Later in the evening, as Richmond walked towards the restroom, Petitioner grabbed her by the wrist and pulled her into a storage area where they keep extra beer and supplies. He grabbed her throat and threw her against the wall. He then touched her breast. Richmond's friend, Nicki, opened the door and asked what Petitioner was doing. Petitioner said that they were just talking, and he slammed the door. Then, the Billie Pomeroy, the bar owner's girlfriend, opened the door and told Petitioner that the room was for employees only. Richmond reported the incident the next day.

Over the objection of the defense, Jane Richards testified as an expert on the subject of sexual assault reporting. Richards, a limited license social worker, was employed by the Women's Center in Marquette, which provides services to victims of domestic and sexual violence. Richards testified that it was not uncommon for sexual assault victims to delay reporting, for a variety of reasons, including fear of retaliation by the rapist, fear of what people will say, fear of being believed, fear of people if the rapist has authority, and fear of the criminal justice system. Richards also testified that immediate reporting was rare. Assault victims also did not want to tell their significant others out of fear for what they might do.

Lori Bal testified that she and Petitioner had been married for eleven years and they had four children. Lori Bal reported that she and Linda Anderson were close friends. She recalled inviting Anderson to go to Polly's Underground in April 2004. According to Lori Bal, Anderson spoke with everyone that night, including Petitioner. Anderson never told her anything about an incident until eight months later. She had coffee with Anderson on a weekly basis and Anderson came to the Bals' house for a 4th of July party. In November, she and Anderson were watching a Dr. Phil episode about cheating spouses. After Lori Bal mentioned that she would leave her husband if she found out he cheated, Anderson told her that Petitioner had come back to her house after dropping her jacket and that he had wanted to have sex with Anderson. Anderson insisted that she had turned him away. Lori Bal immediately went to speak to Petitioner, who admitted having sex with Anderson. Lori Bal became very angry, and she called Anderson to come pick up her children. The Bals and Anderson began to argue. Anderson asked Petitioner why he was lying about them having sex. Petitioner replied that he was tired of hiding it. Anderson finally admitted it was consensual, but she told them that her husband could not find out because he would leave her.

According to Lori Bal, the word "rape" was first used by Anderson's husband the next day, when he called to talk with Petitioner. When Lori Bal confronted Linda Anderson the next day, Anderson began telling her story of the assault. Lori Bal testified that, a week after the incident was revealed, Linda Anderson called Lori and apologized for making the accusation, stating that she had lied about the assault in order to save her marriage.

Mandy Faull and Danielle Dumais testified that they had seen Linda Anderson at the 4th of July party and at a birthday party shortly thereafter. Neither noticed that Anderson was uncomfortable with Petitioner, and Danielle Dumais reported seeing Petitioner and Anderson flirting

and exchanging expressive hugs.  The defense proffered the testimony of Al Dumais, who would say that he saw Anderson at Polly's on the night of the alleged assault, and that Anderson made comments about Dumais' physical appearance and attractiveness.  Flattered by the attention, Dumais took off his shirt, and Anderson rubbed his chest.  The trial court excluded the evidence on the grounds that Dumais' testimony was not relevant to the issues in the case and would violate the Rape Shield Act.  Al Dumais was allowed to testify that he saw Anderson at Polly's and that she did not appear to be uncomfortable.

Petitioner testified that, one night in April 2004, he drove to Polly's with his wife at about 12:30 a.m.  He was seated in the area very near the door of the women's bathroom, but he denied going into it.  Petitioner observed Anderson flirting and talking with Al Dumais.  Anderson told Petitioner that her husband would not be home until the morning, as he was working third shift.  Petitioner asked jokingly if she wanted some company that night, and she replied, "[I]f you're lucky."  (*Id.* at 30.)  At one point, when she walked into the bathroom and saw Petitioner sitting by the bar, she lifted her shirt up and flashed him.  Thereafter, conversation between Petitioner and Anderson became secretive.  Petitioner claimed that Anderson made vulgar comments and, while they were arm wrestling, said "[I]f you win, I'll suck your cock."  (*Id.*)

When he left the bar with his wife at about 12:30, they went to Anderson's home to give her the jacket she had left at the bar.  While there, Petitioner spoke to Anderson in secret about coming back over to her house later, as they had discussed at the bar.  He asked if she was sure she wanted him to come back, and she told him yes.  He returned to Anderson's home some time later and found the door unlocked.  He walked into the kitchen.  He heard some rustling and saw Anderson in bed.  She looked up and said, "[Y]ou came," and he answered, "[Y]es."  (*Id.* at 31.)

-9-

According to Petitioner, Anderson reached up, pulled him in, kissed him, and told him to wait for her downstairs. He went downstairs. When she came downstairs, they had consensual intercourse and talked afterward. While he was getting dressed in the living room, she left the room to get dressed. She came back in crying, and she said, "I can't believe we just did that." (*Id.*) He also began crying and agreed that it was a huge mistake. Petitioner left out the front door.

Petitioner called Anderson a month later, while his wife was out of town. Anderson reportedly said, "I was wondering when you were going to call me." (*Id.*) She told him she was feeling much better and they reiterated that neither would tell their respective spouses what had happened.

Petitioner saw Anderson again at the 4th of July party and the birthday party a few days later. They spoke and hugged, but they never again talked about the incident. Petitioner felt guilty. When his wife confronted him in November about what had happened, he immediately admitted having had consensual sex, despite the fact that Anderson had told Lori Ball that nothing had happened.

Petitioner acknowledged having contact with Janine Willman in 2005 at Greenleaf's and the C&R bar. He stated that he was having marital problems and did not want to go home alone after his wife left for an after-bar party. Petitioner admitted flirting with Willman, but he denied pushing her against the wall or pinning her body. He went to Willman's house because he did not have her phone number. When she was not home, he planned to go home, but Willman told him to come to the party at Tim Payette's house and gave him directions. He reported that he was unable to locate the residence, so he drove home.

Petitioner testified that he met Rachel Richmond in April 2006, when he saw her at Off-the-Wally's Bar. He acknowledged flirting with her and kissing her at the bar, but claimed that was the end of it. He stated that he led Richmond into a back room, but he did not push her and she came willingly. Petitioner also disputed ever having his hand on Richmond's neck. He claimed that both Anderson and Willman were untruthful when they said he pulled their hands and put them on his crotch and said, "[T]his is for you." (*Id.* at 34.) He also said that they were untruthful when they said he pushed them against the wall.

The jury returned a verdict of first-degree criminal sexual conduct and first-degree home invasion. At the time of sentencing, Petitioner filed a motion for judgment notwithstanding the verdict. He argued that his right to a pre-trial polygraph was violated because it was contingent on Petitioner answering questions about unrelated assaults. The prosecutor denied that this was a condition. The court denied the motion.

During sentencing, Petitioner objected to the scoring of several defense variables. The court found the variables properly scored and sentenced Petitioner to a prison term of eleven to twenty years.

Petitioner appealed his convictions and sentences to the Michigan Court of Appeals, which affirmed his convictions and sentences in an unpublished opinion issued September 23, 2008. He sought leave to appeal to the Michigan Supreme Court, which denied leave to appeal on August 6, 2009.

In his habeas application, Petitioner raises the same six issues presented in his state-court appeals:

I.      WHETHER THE GREAT WEIGHT OF THE EVIDENCE PRESENTED WAS INSUFFICIENT TO ESTABLISH BEYOND A REASONABLE DOUBT THAT THE PETITIONER, PHILLIP GREGORY BAL, WAS GUILTY OF CRIMINAL SEXUAL CONDUCT IN THE FIRST DEGREE AND HOME INVASION FIRST DEGREE?

II.      WHETHER THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT PERMITTED THE PROSECUTOR TO INTRODUCE THE TESTIMONY OF TWO WITNESSES UNDER MRE 404B OF UNRELATED AND UNCONVICTED ALLEGATIONS WHERE THE PROBATIVE VALUE IS SUB[S]TANTIALLY OUTWEIGHED BY ITS POTENTIAL FOR UNDUE OR UNFAIR PREJUDICE?

III.      WHETHER THE TRIAL COURT ERRED WHEN IT PERMITTED THE TES[T]IMONY OF AN UNLICENSED SOCIAL WORKER WHO WAS UNQUALIFIED TO PROVIDE EXPERT TESTIMONY AND TO GIVE TESTIMONY AS TO STATISTICS REGARDING DELAYED REPORTING OF SEXUAL ASSAULTS?

IV.      WHETHER THE TRIAL COURT ERRED WHEN IT EXCLUDED THE IMPEACHMENT TESTIMONY OF DEFENSE WITNESS AL DUMAIS ON THE BASIS OF THE RAPE SHIELD ACT WITHOUT A PROPER ANALYSIS AND WITHOUT CONSIDERING A LIMITING INSTRUCTION?

V.      WHETHER THE TRIAL COURT ERRED WHEN IT SCORED THE PETITIONER POINTS FOR SENTENCING OFFENSE VARIABLES 4, 10 AND 13?

VI.      WHETHER THE PETITIONER'S RIGHT TO A PRE-TRIAL POLYGRAPH WAS VIOLATED WHEN THE PROSECUTOR MADE THAT TEST CONTINGENT UPON ANSWERING QUESTIONS REGARDING UNRELATED OFFENSES THAT WERE NOT PART OF THE INFORMATION CHARGED?

(Br. in Supp. of Pet., 6-7.)

## Discussion

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB.

L. 104-132, 110 STAT. 1214 (AEDPA). *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The

AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law. *Bell v. Cone*, 535 U.S. 685, 693-94 (2002). The AEDPA has "drastically changed" the nature of habeas review. *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001). An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court. 28 U.S.C. § 2254(d). This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court. *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655. In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts. *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). The inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal

principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

I.      Lack of Evidence

In his first ground for habeas relief, Petitioner makes two arguments. First, he argues that the prosecution produced insufficient evidence to support his convictions. Second, he asserts that the verdicts were against the great weight of the evidence.

## A.    Sufficiency of the Evidence

A § 2254 challenge to the sufficiency of the evidence is governed by the standard set

forth by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319 (1979), which is "whether,

after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt."  This standard of

review recognizes the trier of fact's responsibility to resolve reasonable conflicts in testimony, to

weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.  *Id.*  Issues

of credibility may not be reviewed by the habeas court under this standard.  *See Herrera v. Collins*,

506 U.S. 390, 401-02 (1993).   Rather, the habeas court is required to examine the evidence

supporting the conviction, in the light most favorable to the prosecution, with specific reference to

the elements of the crime as established by state law.  *Jackson*, 443 U.S. at 324 n.16; *Allen v.

Redman*, 858 F.2d 1194, 1196-97 (6th Cir. 1988).

In addressing Petitioner's sufficiency claim, the Michigan Court of Appeals recited

the Michigan standard, which is identical to the *Jackson* standard.  *See People v. Petrella*, 380

N.W.2d 11, 32 (Mich. 1985) (citing *Jackson*, 443 U.S. at 319); *People v. Hampton*, 285 N.W.2d 284

(Mich. 1979) (same).  Applying that standard, the court held as follows:

> Here, the victim's testimony established that defendant entered her home
> without permission, while the victim and her children were present, and that he
> sexually penetrated her without her consent.  Thus, viewed in a light most favorable
> to the prosecution, the evidence is sufficient to enable the jury to find that the
> prosecutor proved all the elements of first-degree CSC, MCL 750.520b(1)(c), and
> first-degree home invasion, MCL 750.110a(2)(b) beyond a reasonable doubt.
> Contrary to defendant's argument on appeal, the victim's credibility cannot be
> considered in evaluating the sufficiency of the evidence.

(9/23/08 Mich. Ct. App. Op. (MCOA Op.), 2, Am. Pet., 23, docket #4.)

Petitioner was convicted of first-degree criminal sexual conduct under MICH. COMP.

LAWS § 750.520b(1)(c), which provides as follows:

> Sec. 520b. (1) A person is guilty of criminal sexual conduct in the first degree if he
> or she engages in sexual penetration with another person and if any of the following
> circumstances exists:
>
> . . .
>
> (c) Sexual penetration occurs under circumstances involving the commission of any
> other felony.

*Id.* Petitioner does not dispute that he engaged in sexual penetration with Anderson. And Petitioner

unquestionably was convicted of another felony, first-degree home invasion. As a result, his dispute

rests on whether sufficient evidence existed to prove the felony of first-degree home invasion.[1]

Under Michigan law,

> (2) A person who breaks and enters a dwelling with intent to commit a felony,
> larceny, or assault in the dwelling, a person who enters a dwelling without permission
> with intent to commit a felony, larceny, or assault in the dwelling, or a person who
> breaks and enters a dwelling without permission and, at any time while he or she is
> entering, present in, or exiting the dwelling, commits a felony, larceny, or assault is
> guilty of home invasion in the first degree if at any time while the person is entering,
> present in, or exiting the dwelling either of the following circumstances exists:
>
> . . .
>
> (b) Another person is lawfully present in the dwelling.

MICH. COMP. LAWS § 750.110a(2)(b).

Petitioner admitted at trial that he entered Anderson's house. He contends that he had

permission to do so. However, Anderson clearly testified that she did not invite Petitioner back that

---

[1] As a practical matter, to prove first-degree criminal sexual conduct, the state would not have needed to prove
that the home invasion was of the first-degree, as all degrees of home invasion under Michigan law are felonies. *See*
MICH. COMP. LAWS § 750.110a(5)-(7). However, since Petitioner contests the sufficiency of the evidence supporting
the first-degree home invasion conviction, the Court will consider that charge to be the felony in issue.

evening. Accepting Anderson's testimony, a jury reasonably could have concluded beyond a reasonable doubt that Petitioner entered the house without permission. Further, Petitioner admitted that he found the house unlocked and opened the door. Under Michigan law, opening a closed door is sufficient to satisfy the breaking element, even if the door is unlocked. *See People v. Wise*, 351 N.W.2d 255, 259 (Mich. Ct. App. 1984). It is undisputed that Anderson and her children were lawfully in the home at the time. Finally, because Anderson squarely testified that she did not consent to the sexual penetration, a jury reasonably could conclude that Petitioner committed a felony while he was present in the dwelling. While Petitioner makes numerous arguments about Anderson's credibility and the lack of corroboration, it was the jury's role as factfinder to determine credibility of all witnesses. *Jackson*, 443 U.S. at 319. Anderson's testimony provided ample evidence to support all of the jury's findings. For all these reasons, the state court's application of *Jackson* was entirely reasonable.

### B.       Against the Great Weight of the Evidence

Petitioner next argues that the jury's convictions were against the great weight of the evidence. Under Michigan law, a new trial may be granted when the evidence preponderates so heavily against the verdict that a serious miscarriage of justice would result if the verdict is allowed to stand. *See People v. Lemmon*, 576 N.W.2d 129, 134 (Mich. 1998); *see also* MICH. COMP. LAWS § 770.1 (authorizing a trial judge to grant a new trial when it appears that justice has not been done); MICH. CT. R. 6.431(B) (permitting the grant of new trial for, among other reasons, a belief that the verdict has resulted in a miscarriage of justice).

It is not the province of a federal habeas court to re-examine state-law determinations on state-law questions. *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle v. McGuire*, 502 U.S.

-17-

62, 68 (1991). A habeas petition must "state facts that point to a 'real possibility of constitutional error.'" *Blackledge v. Allison*, 431 U.S. 63, 75 n.7 (1977) (quoting Advisory Committee Notes on Rule 4, RULES GOVERNING HABEAS CORPUS CASES). Therefore, Petitioner's state-law claim is not cognizable in a federal habeas proceeding. Moreover, the Supreme Court has never recognized a prisoner's constitutional right to a new trial because the verdict was against the great weight of the evidence. Petitioner therefore fails to raise a meritorious federal claim.

## II. Other Acts Evidence

In his second ground for habeas relief, Petitioner asserts that the trial court abused its discretion in admitting the testimony of Janine Willman and Rachel Richmond about Petitioner's other bad acts. He argues that the testimony was improperly admitted under Michigan Rule of Evidence 404(b)(1). He also argues that the unfair prejudice of the evidence substantially outweighed any probative value. *See* MICH. R. EVID. 403.

As previously discussed, the extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle*, 502 U.S. 62, an inquiry into whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68.

State-court evidentiary rulings cannot rise to the level of due process violations unless they "'offend[] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental.'" *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quoting

*Montana v. Egelhoff*, 518 U.S. 37, 43 (1996)); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th

Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state

courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552.

    Petitioner cannot meet this difficult standard. The Supreme Court specifically has

recognized that the admission of evidence of uncharged crimes ordinarily does not raise a

constitutional issue. In *Lisenba v. California*, 314 U.S. 219 (1941), the Supreme Court held that the

states are free under the Fourteenth Amendment to admit evidence of uncharged crimes in criminal

cases when relevant to issues such as intent, design, or system. 314 U.S. at 227-28. *See also Estelle*,

502 U.S. 62 (holding that the admission of evidence of other bad acts does not violate due process).

    Nor can Petitioner demonstrate that, on the facts of this case, the use of evidence of

other bad acts was so extreme and prejudicial that it deprived Petitioner of fundamental fairness.

As the court of appeals recognized, the evidence provided by the two witnesses contained numerous

similarities to the assault at issue in the trial:

> Like the charged offense in this case, the other incidents involved defendant
> approaching women – whom he had met or known previously – in bars, making
> sexual remarks toward them, pushing them against a wall, and then making or
> attempting forced sexual contact against their will. In each case, defendant also
> attempted to find out where the women lived in order to continue his sexual pursuit.
> The other incidents were sufficiently similar to the charged offense to support an
> inference that defendant committed the charged offense using the same design,
> method, or plan that he used in the uncharged acts.

(9/23/08 MCOA Op., 2.) Moreover, Petitioner acknowledges that the trial court instructed the jury

that its consideration of the other crimes was limited to determining whether it showed a common

scheme or plan. (Br. in Supp. of Pet., 41.) Because the admission of other bad acts was both

relevant and not constitutionally impermissible to show a common scheme, and because the trial

court reasonably limited the evidence and provided an appropriate instruction, admission of the evidence was not fundamentally unfair.

Petitioner next suggests that, because Federal Rule of Evidence 404(b) parallels the Michigan rule, the evidence would violate federal law and thus be appropriate for review in this Court. He contends that, under *Huddleston v. United States*, 485 U.S. 681, 691-92 (1988), and circuit cases interpreting Federal Rule of Evidence 404(b), the testimony in question would have been inadmissible in the federal courts.

Petitioner's argument is frivolous. Petitioner was convicted in the state courts under state law. The Federal Rules of Evidence do not apply to the state courts. The *Huddleston* decision merely interpreted Federal Rule of Evidence 404(b); it in no way indicated that the basis of its decision was constitutional or applicable to the state courts. *Id.* at 691-92.

For all these reasons, Petitioner's claim that the state court erred in admitting evidence of other bad acts fails to raise a claim of constitutional magnitude. Therefore, the state-court's evidentiary holding was neither contrary to nor an unreasonable application of established Supreme Court precedent.

III.    Admission of Expert Testimony

Petitioner contends that the trial court erred when it permitted an unlicensed social worker to provide expert testimony about the statistics involving delayed reporting of sexual assaults.

As previously discussed, an inquiry into the admission of evidence at trial ordinarily presents a question of state law. *Estelle*, 502 U.S. at 67-68. In order to state a cognizable claim on habeas review, a petitioner must demonstrate that the decision to admit or exclude evidence violates a fundamental principle of justice. *Seymour*, 224 F.3d at 552.

Petitioner makes no attempt to demonstrate a constitutional deprivation. Instead, he principally argues that the evidence was admitted in violation of state law, as set forth in Michigan Rule of Evidence 702 and *Gilbert v. DaimlerChrysler Corp.*, 685 N.W.2d 391 (2004). Petitioner's claim rests on state law and is noncognizable. *Estelle*, 502 U.S. at 67-68.

Petitioner also argues that the expert evidence was improperly admitted under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 588 (1993). As discussed above, the Federal Rules of Evidence apply in federal trial proceedings, not in state trial proceedings. The Supreme Court strictly engaged in statutory construction in interpreting Rule 702 in *Daubert*. *See* 509 U.S. at 587. The Court has never indicated that a failure to follow Federal Rule of Evidence 702 or *Daubert* rises to the level of a constitutional violation. As a consequence, Petitioner cannot show that the state court's evidentiary determination was either contrary to or an unreasonable application of established Supreme Court precedent.

IV.     Exclusion of Al Dumais' Testimony

In his fourth ground for habeas relief, Petitioner complains that the trial court erred when it excluded Al Dumais' testimony about Ms. Anderson's behavior at Polly's on the night in question. Petitioner claims that Al Dumais' testimony that Anderson was flirtatious with him was relevant to impeach her claim that she was uncomfortable at the bar.

Petitioner first argues that Dumais' proffered testimony was improperly excluded under Michigan's Rape Shield Law, Mich. Comp. Laws § 750.520j. To the extent Petitioner argues the application of the Michigan Rape Shield Law, his claim is not cognizable on habeas review. *See Estelle*, 502 U.S. at 67-68.

Petitioner next argues that exclusion of Dumais' evidence violated the Confrontation Clause. The Michigan Court of Appeals did not expressly address this portion of the argument, and it is not clear whether Petitioner actually raised this part of his claim in the state courts.[2]

The Sixth Amendment guarantees a defendant the right to be confronted with the witnesses against him. U.S. CONST., amend. VI. The right to confrontation includes the right to conduct reasonable cross-examination. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974). Cross-examination is the "principal means by which the believability of a witness and the truth of his testimony are tested." *Id.* at 316, *quoted in Lewis v. Wilkinson*, 307 F.3d 413, 419 (6th Cir. 2002). The exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination. *Davis*, 415 U.S. at 316-17. In analyzing whether an evidentiary restriction violated the Confrontation Clause, "the Supreme Court has 'distinguished between a "general attack" on the credibility of a witness – in which the cross-examiner "intends to afford the jury a basis to infer that the witness's character is such that he would be less likely than the average trustworthy citizen to be truthful in his testimony" – and a more particular attack on credibility "directed toward revealing possible biases, prejudices, or ulterior motives as they may relate directly to issues or personalities in the case at hand."'" *Lewis*, 307 F.3d

---

[2]Before the Court may grant habeas relief to a state prisoner, the prisoner must exhaust remedies available in the state courts. 28 U.S.C. § 2254(b)(1); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999). Exhaustion requires a petitioner to "fairly present" federal claims so that state courts have a "fair opportunity" to apply controlling legal principles to the facts bearing upon a petitioner's constitutional claim. *See O'Sullivan*, 526 U.S. at 842; *Picard v. Connor*, 404 U.S. 270, 275-77 (1971), *cited in Duncan v. Henry*, 513 U.S. 364, 365 (1995), and *Anderson v. Harless*, 459 U.S. 4, 6 (1982). To fulfill the exhaustion requirement, a petitioner must have fairly presented his federal claims to all levels of the state appellate system, including the state's highest court. *Duncan*, 513 U.S. at 365-66; *Silverburg v. Evitts*, 993 F.2d 124, 126 (6th Cir. 1993); *Hafley v. Sowders*, 902 F.2d 480, 483 (6th Cir. 1990). Petitioner has not provided his brief from the Michigan Court of Appeals. It therefore is not entirely clear whether Petitioner actually exhausted his constitutional claim. However, a habeas corpus petition may be denied on the merits, notwithstanding the lack of exhaustion. 28 U.S.C. § 2254(b)(2). Because the claim lacks merit, the Court need not address the exhaustion issue.

at 419 (quoting *Boggs v. Collins*, 226 F.3d 728, 736 (6th Cir. 2000)) (citing *Davis*, 415 U.S. at 316). "Under *Davis* and its progeny, the Sixth Amendment only compels cross-examination if that examination aims to reveal the motive, bias or prejudice of a witness/accuser." *Boggs*, 226 F.3d at 740.

Here, the proffered testimony was only relevant to challenge Anderson's general credibility on the tangential question of whether she was uncomfortable at Polly's. The evidence was not relevant to any bias, prejudice or ulterior motive. *Boggs*, 226 F.3d at 740. The trial court's exclusion of the evidence therefore did not implicate the Confrontation Clause. As a consequence, the state court's decision to exclude Dumais' proffered testimony was not contrary to nor an unreasonable application of established Supreme Court precedent.

Moreover, even if Petitioner could demonstrate a Confrontation Clause violation, he would not be entitled to habeas relief. Alleged Confrontation Clause violations normally are subject to harmless-error analysis. *Hargrave v. McKee*, 248 F. App'x 718, 728 (6th Cir. 2007) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 681-84 (1986)). On habeas review, a court must assess harmlessness under the standard set forth in *Brecht v. Abrahamson*, 507 U.S. 619 (1993), regardless of whether the state appellate court recognized the error and reviewed it for harmlessness. *See Hargrave*, 248 F. App'x at 728 (citing *Fry v. Pliler*, 551 U.S. 112, 129 S. Ct. 2321, 2328 (2007)); s*ee also Vasquez v Jones*, 496 F.3d 564, 574-75 (6th Cir. 2007). The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638. In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence

of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave*, 248 F. App'x at 728 (quoting *Van Arsdall*, 475 U.S. at 684).

As discussed, Dumais' testimony was only tangentially relevant to Anderson's credibility about her comfort at the bar. In addition, Dumais was allowed to testify that he saw Anderson at Polly's and that she did not appear to be uncomfortable. Further, Petitioner himself testified that he had observed Anderson flirting with Dumais. As a result, the excluded testimony was highly unlikely to have had impact on the jury's assessment of Anderson's credibility regarding the charged offenses, which occurred later in the evening. Accordingly, any Confrontation Clause violation was harmless.

V.     Sentence Scoring

Petitioner argues that the trial court incorrectly scored Offense Variables 4, 10 and 13. Claims concerning the improper scoring of sentencing guidelines are state-law claims and typically are not cognizable in habeas corpus proceedings. *See Hutto v. Davis*, 454 U.S. 370, 373-74 (1982) (federal courts normally do not review a sentence for a term of years that falls within the limits prescribed by the state legislature); *Austin v. Jackson*, 213 F.3d 298, 301-02 (6th Cir. 2000) (alleged violation of state law with respect to sentencing is not subject to federal habeas relief); *Cheatham v. Hosey*, No. 93-1319, 1993 WL 478854, at *2 (6th Cir. Nov. 19, 1993) (departure from sentencing guidelines is an issue of state law, and, thus, not cognizable in federal habeas review); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999) (the sentencing guidelines establish only rules of state law). There is no constitutional right to individualized sentencing. *United States v. Thomas*, 49 F.3d 253, 261 (6th Cir. 1995). Moreover, a criminal defendant has "no federal

constitutional right to be sentenced within Michigan's guideline minimum sentence recommendations." *Doyle v. Scutt*, 347 F. Supp. 2d 474, 485 (E.D. Mich. 2004); *accord Lovely v. Jackson*, 337 F. Supp. 2d 969, 977 (E.D. Mich. 2004); *Thomas v. Foltz*, 654 F. Supp. 105, 106-07 (E.D. Mich. 1987).

Although state law errors generally are not reviewable in a federal habeas proceeding, an alleged violation of state law "could, potentially, 'be sufficiently egregious to amount to a denial of equal protection or of due process of law guaranteed by the Fourteenth Amendment.'" *Koras v. Robinson,* 123 F. App'x 207, 213 (6th Cir. Feb. 15, 2005) (citing *Bowling v. Parker*, 344 F.3d 487, 521 (6th Cir. 2003)). *See also Doyle*, 347 F. Supp. 2d at 485 (a habeas court "will not set aside, on allegations of unfairness or an abuse of discretion, terms of a sentence that is within state statutory limits unless the sentence is so disproportionate to the crime as to be completely arbitrary and shocking.") (citation omitted). A sentence may violate due process if it is based upon material "misinformation of constitutional magnitude." *Koras,* 123 F. App'x at 213 (quoting *Roberts v. United States,* 445 U.S. 552, 556 (1980)); *see also United States v. Tucker,* 404 U.S. 443, 447 (1972); *Townsend v. Burke,* 334 U.S. 736, 741 (1948). To prevail on such a claim, the petitioner must show (1) that the information before the sentencing court was materially false, and (2) that the court relied on the false information in imposing the sentence. *Tucker*, 404 U.S. at 447; *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984). *Koras,* 123 F. App'x at 213 (quoting *United States v. Stevens,* 851 F.2d 140, 143 (6th Cir. 1988)). A sentencing court demonstrates actual reliance on misinformation when the court gives "explicit attention" to it, "found[s]" its sentence "at least in part" on it, or gives "specific consideration" to the information before imposing sentence. *Tucker*, 404 U.S. at 444, 447.

Petitioner's sentence clearly is not so disproportionate to the crime as to be arbitrary or shocking. *Doyle*, 347 F. Supp. 2d at 485. Further, Petitioner does not even argue that the facts found by the court at sentencing were either materially false or based on false information. *Tucker*, 404 U.S. at 447. Instead, Petitioner argues only that the court's sentencing findings were not sufficiently supported or that the court should have reached a different conclusion on the evidence before it. Such claims clearly fall far short of the sort of egregious circumstances implicating due process. The state-court's rejection of Petitioner's claim was not based on an unreasonable determination of the facts and was neither contrary to nor an unreasonable application of established Supreme Court precedent. 28 U.S.C. § 2254(d).

Petitioner next suggest that the trial court violated his rights under the Sixth Amendment by improperly basing its sentence on facts not found by the jury or admitted by Petitioner. Petitioner's argument rests largely on the United States Supreme Court holding in *Blakely v. Washington*, 542 U.S. 296 (2004). *Blakely* concerned the State of Washington's determinate sentencing system, which allowed a trial judge to elevate the maximum sentence permitted by law on the basis of facts not found by the jury but by the judge. Applying the Washington mandatory sentencing guidelines, the trial judge found facts that increased the maximum sentence faced by the defendant. The Supreme Court found that this scheme offended the Sixth Amendment, because any fact that increases or enhances a penalty for the crime beyond the prescribed statutory maximum for the offense must be submitted to the jury and proven beyond a reasonable doubt. *Blakely,* 542 U.S. at 301 (citing *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000)).

Unlike the State of Washington's determinate sentencing system, the State of Michigan has an indeterminate sentencing system in which the defendant is given a sentence with a minimum and a maximum term. The maximum sentence is not determined by the trial judge, but is set by law. *See People v. Drohan,* 715 N.W.2d 778, 789-92 (Mich. 2006) (citing MICH. COMP. LAWS § 769.8). Only the minimum sentence is based on the applicable sentencing guideline range. *Id.*; *and see People v. Babcock*, 666 N.W.2d 231, 237 n.7 (Mich. 2003) (citing MICH. COMP. LAWS § 769.34(2)). Therefore, under Michigan law, the trial judge sets the minimum sentence (within a certain range), but can never exceed the maximum sentence. *See Chontos v. Berghuis*, 585 F.3d 1000, 1002 (6th Cir. 2009) (*Apprendi* line of cases does not apply to Michigan's indeterminate sentencing scheme because judicial factfinding affects only the minimum sentence); *Drohan,* 715 N.W.2d at 789.

Because the trial court can never exceed the maximum sentence set by statute, Michigan's indeterminate sentencing scheme, unlike the determinate sentencing scheme at issue in *Blakely*, does not infringe on the province of the finder of fact, and, thus, does not run afoul of *Blakely*. *Blakely,* 542 U.S. at 304-05, 308-09. Because the trial court in the present case sentenced Petitioner well within the parameters of Michigan's indeterminate sentencing scheme, it did not violate his Sixth Amendment rights. *See Chontos*, 585 F.3d at 1002; *Tironi v. Birkett*, 252 F. App'x 724, 725 (6th Cir. 2007) (affirming district court's dismissal of prisoner's claim under *Blakely v. Washington* because it does not apply to Michigan's indeterminate sentencing scheme); *see also Gray v. Bell*, No. 1:06-cv-611, 2007 WL 172519, at *3 (W.D. Mich. Jan. 19, 2007); *Pettiway v. Palmer,* No. 1:06-cv-132, 2006 WL 1430062, at *1 (W.D. Mich. May 23, 2006); *Stanley v. Jones,* No. 1:06-cv-49, 2006 WL 1459832, at *2 (W.D. Mich. May 23, 2006); *Jones v. Trombley*, No. 2:07-

cv-10139, 2007 WL 405835, at *3 (E.D. Mich. Jan. 31, 2007); *Mays v. Trombley*, No. 2:06-cv-14043, 2006 WL 3104656, at *3 (E.D. Mich. Oct. 31, 2006); *Worley v. Palmer,* No. 2:06-cv-13467, 2006 WL 2347615, at * 2 (E.D. Mich. Aug. 11, 2006); *George v. Burt*, No. 2:04-cv-74968, 2006 WL 156396, at *5 (E.D. Mich. Jan. 20, 2006); *Walton v. McKee*, No. 2:04-cv-73695, 2005 WL 1343060, at *3 (E.D. Mich. June 1, 2005).

VI.      Denial of Pretrial Polygraph

Petitioner's final habeas claim is that he was denied his right under MICH. COMP. LAWS § 776.21(5) to receive a polygraph examination.  Petitioner acknowledges that his claim under state law is not cognizable in this habeas proceeding.  He also admits that the Supreme Court has never held that, as a constitutional matter, polygraph evidence must be admitted in any criminal trial or that such evidence is reliable.  *See United States v. Scheffer*, 523 U.S. 303 (1998).

Petitioner contends, however, that the prosecutor's actions in conditioning the polygraph on other related cases amounted to prosecutorial misconduct of a constitutional magnitude.[3]  Misconduct by a prosecutor may rise to the level of a due process violation.  For relief to be granted, the prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  When a petitioner makes a claim of prosecutorial misconduct, "the touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

---

[3]Once again, it is unclear whether Petitioner raised a claim of prosecutorial misconduct in the state court.  He arguably has failed to exhaust his state-court remedies.  *See O'Sullivan*, 526 U.S. at 842.  The Court nevertheless will address the claim on the merits without requiring exhaustion.  *See* 28 U.S.C.§ 2254(B)(2).

Here, Petitioner does not argue that he was entitled to admit polygraph evidence at trial. Instead, he argues that he should have been permitted under state law to take a polygraph. Under long settled Michigan law, regardless of its result, a polygraph is not admissible at trial. *See People v. Becker*, 2 N.W.2d 503 (1942). As result, even assuming the prosecutor improperly set conditions on Petitioner's statutory right to take a polygraph, the prosecutor's conduct could not and did not have any impact on the fairness of the trial. Petitioner therefore fails to demonstrate that the state-court decision was unreasonable under established federal law.

## Conclusion

In light of the foregoing, the Court will summarily dismiss Petitioner's application pursuant to Rule 4 because it fails to raise a meritorious federal claim.

## Certificate of Appealability

Under 28 U.S.C. § 2253(c)(2), the Court must determine whether a certificate of appealability should be granted. A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This Court's dismissal of Petitioner's action under Rule 4 of the Rules Governing § 2254 Cases is a determination that the habeas action, on its face, lacks sufficient merit to warrant service. It would be highly unlikely for this Court to grant a certificate, thus indicating to the Sixth Circuit Court of Appeals that an issue merits review, when the Court has already determined that the action is so lacking in merit that service is not warranted. *See Love v. Butler*, 952 F.2d 10 (1st Cir. 1991) (it is "somewhat anomalous" for the court to summarily dismiss under Rule 4 and grant a certificate); *Hendricks v. Vasquez*, 908 F.2d 490 (9th Cir. 1990) (requiring reversal where court summarily dismissed under Rule 4 but granted certificate); *Dory v. Comm'r of Corr. of the State of New York*, 865 F.2d 44, 46 (2d Cir. 1989) (it was "intrinsically contradictory" to grant a certificate when habeas action does not

warrant service under Rule 4); *Williams v. Kullman*, 722 F.2d 1048, 1050 n.1 (2d Cir. 1983) (issuing certificate would be inconsistent with a summary dismissal).

The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability. *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001). Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted. *Id.* at 467. Each issue must be considered under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000). *Murphy*, 263 F.3d at 467. Consequently, this Court has examined each of Petitioner's claims under the *Slack* standard. Under *Slack*, 529 U.S. at 484, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

The Court finds that reasonable jurists could not conclude that this Court's dismissal of Petitioner's claims was debatable or wrong. Therefore, the Court will deny Petitioner a certificate of appealability.

A Judgment and Order consistent with this Opinion will be entered.

Dated:      February 23, 2010              /s/ Robert J. Jonker
                                           ROBERT J. JONKER
                                           UNITED STATES DISTRICT JUDGE